Michael Herzog
THE HERZOG LAW FIRM, P.C.
14350 N. 87th Street, Suite 180
Scottsdale, Arizona 85260
Telephone: 480-264-0842
Facsimile: 480-422-9008
*Admitted Pro Hac Vice

John Heenan
BISHOP & HEENAN
3970 Avenue D, Suite A
Billings, MT 59102
Telephone: (406) 839-9091
Facsimile:   (406) 839-9092

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION**

| | |
|---|---|
| MICHAEL COBOS and LINDA COBOS, husband and wife,<br><br>　　　　　　　　　Plaintiffs,<br>vs.<br><br>STILLWATER MINING COMPANY, a Delaware corporation,<br><br>　　　　　　　　　Defendants. | Cause No.: CV-11-18-BLG-RFC<br><br>**PLAINTIFFS' COMBINED BRIEF IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Under well-settled federal and Montana law, SMC, as the mine owner, had a non-delegable duty to provide a work environment free from cancerous airborne contaminants. As set forth below, Mr. Cobos is entitled to a ruling as a matter of

law that SMC did owe him a duty to provide a safe workplace, and is further entitled to let a jury determine whether SMC breached its duty in this regard.

## FACTS

The SMC mine is a below-ground platinum and palladium mine. The miners at SMC work in underground environments in 8 hour shifts where they never reach the surface. A critical aspect of SMC's mine, therefore, is ensuring proper and safe ventilation. To this end, SMC utilizes ventilation planning to ensure that fresh air reaches all corners of the mine including the placement of fresh air intakes, ventilation shafts, primary fans, auxiliary fans and ventilation tubing, all of which is meant to ensure that fresh, clean air gets to the miner.

Michael Cobos worked as an underground shift miner at SMC from July, 2000 through December, 2001. Over the course of his employment as a miner at the Stillwater Mine, Mr. Cobos operated hand-held drills and machinery in extracting minerals and waste from the palladium and platinum mine. His job included loading the holes drilled in the rock cave with explosives and detonating those explosives. He was then required to remove the broken rock after it had been blasted. Mr. Cobos consistently worked in an underground atmosphere filled with airborne dust and particles generated in the mining operations.

In late 2008, Mr. Cobos began to experience frequent nosebleeds and difficulty breathing through his nose. He has never been a smoker. Although

initially told he had allergy symptoms, Mr. Cobos was ultimately diagnosed in March, 2009 with squamous cell carcinoma of the nasal septum, pharynx and sinuses, with metastasis to the skull base and frontal lobe of the brain. Mr. Cobos has undergone a series of invasive surgeries along with chemoradiation. Mr. Cobos' medical providers, across several disciplines, have causally connected the development of his squamous cell carcinoma with the exposure to platinum and palladium encountered in Defendants' mine. Mr. Cobos' illness has significantly progressed since diagnosis, and although his medical treatment is ongoing, his disease is described as recurrent.

At all times pertinent to Mr. Cobos' work at the Stillwater Mine, SMC maintained sole responsibility to provide adequate ventilation. Moreover, SMC was exclusively responsible for providing the testing equipment necessary to monitor air quality. Since the time period Mr. Cobos worked there, SMC has extensively upgraded its mine ventilation systems including increasing the volume of fresh air and minimizing the re-use of air in the mine. SMC's upgrades have resulted in a corresponding drop of carbon presence to $1/8^{th}$ the level which was present when Cobos worked there.

## LEGAL STANDARD

The parties cross-motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure.  Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure:

> A party may move for summary judgment, identifying each claim or defense- or the part of each claim or defense- on which summary judgment is sought. The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The Court should state on the record the reasons for granting or denying the motion.  Plaintiff requests that this Court grant summary judgment as to the element of duty.

## LEGAL ARGUMENT

Determining whether a general contractor, developer, or owner has a duty to a sub-contractor's employee begins with the general rule that there is no duty absent some form of control.  *Shannon v. Howard S. Wright Construction Co.*, 181 Mont. 269, 593 P.2d 438 (1979). There are, however, so many exceptions to the general rule of non-liability that the rule is applied "only when there is no good reason found not to apply it." *Shannon,* 593 P.2d at 442.  Indeed, the general rule has been described as "primarily important as a preamble to the catalogue of its exceptions." *Id.*

"An owner has a duty under the Montana Safety Act, regardless of 'employer' status, where: (1) there is a contractual duty; (2) the activity is inherently dangerous; or (3) the owner negligently exercises control." *Rose v. True*

*Oil, LLC,* CV-07-04-BLG-RFC (D. Mont. May 30, 2007) (attached) *citing Umbs v. Sherrod, Inc.*, 246 Mont. 373, 376 (1991). In this case, as set forth below, SMC owed Plaintiff Cobos a duty under the Montana Safety Act under any of the three enumerated factors.

**I.    SMC ASSUMED A DUTY TO PROVIDE CLEAN AIR AND RETAINED A SUPERVISORY DUTY TO ENSURE SAFE MINING PRACTICES.**

"Liability may be based on a non-delegable duty of the owner only when a contractual provision establishes that the owner has assumed responsibility for initiating, maintaining, and supervising safety precautions." *Fabich v. PPL Montana*, 2007 MT 258, ¶ 39, 339 Mont. 289 (emphasis added.) Importantly, "evidence of such a provision is not necessary to establish that a general contractor had a duty based on a theory of retained control." *Beckman v. Butte-Silver Bow County*, 2000 MT 112, ¶ 35, 299 Mont. 389 *citing Micheletto v.* 244 Mont. 483 (1990) ("regardless of whether the general contractor has assumed safety duties contractually, if the general contractor retains control *over any part* of an independent contractor's work the general contractor has a duty of reasonable care to third parties in exercising such control.") and *Umbs,* 246 Mont. at 377 (reversing summary judgment in favor of general contractor because general contractor knew of the dangerous condition and ordered its subcontractor's employee to continue working.)

Here, SMC assumed contractual responsibility in three separate ways.

First, SMC contractually assumed <u>sole</u> responsibility to provide "[a]dequate ventilation through ducting to the work place." (SUF Exhibit "A" at pg. 34.) In this regard, SMC was exclusively responsible for the ventilation system in place at the mine, including: fresh air intakes, ventilation shafts, primary fans, auxiliary fans and ventilation tubing, all of which is meant to ensure that fresh, clean air gets to the miner. (SGI at ¶ 1.) Moreover, SMC was the exclusive provider of the testing equipment necessary for monitoring air quality. (SUF at Exhibit "A" at pg. 36.) Since the time period Mr. Cobos worked there, SMC has extensively upgraded its mine ventilation systems including increasing the volume of fresh air and minimizing the re-use of air in the mine. (SGI at ¶ 4.) SMC's upgrades have resulted in a corresponding drop of carbon presence to $1/8^{th}$ the level which was present when Cobos worked there. (*Id.*) This case <u>solely</u> concerns Mr. Cobos' exposure to airborne contaminants. Because SMC was <u>exclusively</u> responsible under the contract for providing adequate ventilation, it owed Mr. Cobos a non-delegable duty to provide breathable air free of cancer-causing contaminants.

Second, SMC retained supervisory control over Thyssen with respect to mine safety. Specifically, the contract provided under the heading "Conduct of the Work" the following pertinent language:

> [H]owever, SMC will exercise the absolute right to direct the immediate cessation or correction of any unsafe or unhealthy act of any individual on the work site.

(SGI at ¶ 5.)  Thus, because SMC retained exclusive supervisory control of Thyssen's work practices- including the right to immediately stop or correct them- SMC had a non-delegable duty to ensure Mr. Cobos was mining in an area free of cancerous airborne particulates.  *See Fabich, supra* (non-delegable duty may be based on contractor's retained control); *see also Rooney v. United States*, 634 F.2d 1238 (9th Cir. 1980) (applying California law and holding employer of contractor liable for injuries to employee of contractor where contract merely reserved the employer's right to inspect the work performed and to stop the work if adequate precautions were not taken, the court declared because contractor failed to follow safety specifications in contract).

Third, the contract provides that Thyssen was to assume liability for the health and safety of its employees "to the extent allowed by law."  (SUF ¶ 13.) SMC's attempt to place the obligation to provide for the health and safety of miners at the SMC mine is <u>directly contrary to federal law</u> regarding mine responsibility, and therefore is not permitted under federal law or the contract between SMC and Thyssen.

At the time Michael Cobos was working at the SMC mine, safety at the mine was governed by the Federal Mine Safety and Health Act of 1977 ("FMSHA").[1] In Section 2 of FMSHA of 1977, Congress described the findings and purpose behind FMSHA and noted that, "The first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource – the miner." Congress went on to note concerns about unsafe and unhealthful conditions and practices in the mining industry. At Section 2(e), Congress stated that, "**the operators of such mines with the assistance of the miners have the primary responsibility to prevent the existence of such conditions and practices in such mines**." (emphasis added.)

Section 3(d) of the FMSHA defines an operator of a mine as any "owner, lessee, or other person who operates, controls or supervises a coal or other mine…" Thus, SMC is clearly an operator of the mine at issue. As such, SMC, pursuant to Section 2(e) of FMSHA, had the primary responsibility to prevent the existence of unsafe and unhealthful conditions and practices in the mine at issue.

At the time that Mr. Cobos worked at SMC as well as the present time, the statutes dealing with mine safety have been enforced by the Mine Safety and Health Administration ("MSHA"). As part of its work in this field, MSHA issues

---

[1] FMSHA of 1977 was amended by the Miner Act of 2006, but because of the dates of Mr. Cobos' employment at the SMC mine, the Miner Act of 2006 is not applicable to this case.

a Program Policy Manual.  The argument of SMC here- that it can legally delegate its safety obligations to contractors like Thyssen- is specifically and directly rejected by the MSHA Program Policy Manual, which states in pertinent part at Volume III, Part 45-1:

> MSHA's enforcement policy regarding independent contractors does not change production-operators' basic compliance responsibilities. Production-operators are subject to all provisions of the Act, and to all standards and regulations applicable to their mining operations.  This overall compliance responsibility includes assuring compliance by independent contractors with the Act and with applicable standards and regulations.  As a result, both independent contractors and production-operators are responsible for compliance with all applicable provisions of the Act, standards and regulations.

Thus, pursuant to federal law, the obligation of SMC, as the operator of the mine, is to comply with all safety regulations, and the obligation to comply with those safety regulations **cannot** be delegated to an independent contractor such as Thyssen.  *See also* SGI ¶ 6 (Expert Report of Former MSHA Safety Inspector Rod Breland criticizing SMC's safety practices).  While it may be true that Thyssen had independent obligations under FMSHA, the MSHA Program Policy Manual makes it clear that whatever obligations Thyssen had did not diminish the non-delegable obligations of SMC to **all** of the miners working at the SMC mine.

For any and all of these reasons, SMC is liable under the Montana Safety Act's "contractual duty" prong.

## II. MR. COBOS' EXCAVATION AND MINING DUTIES WERE INHERENTLY DANGEROUS ACTIVITIES.

"An employer is vicariously liable for injuries to others caused by a subcontractor's failure to take precautions to reduce the unreasonable risks associated with engaging in an inherently dangerous activity." *Beckman*, 2000 MT 112, ¶ 24. The Montana Supreme Court has specifically held that excavating is an inherently dangerous activity. *Beckman, supra.*[2] *See also Vannoy v. Warren,* 168 N.W.2d 486 (Mich. 1968) (excavator overcome by gas in a city sewer was performing inherently dangerous work under Michigan law); *Hagberg v. Sioux Falls*, 281 F. Supp. 460 (D. SD 1968) (excavation of a sewer and use of explosives in connection therewith was an intrinsically dangerous operation under South Dakota law.)

While apparently conceding- as it must- that excavating is inherently dangerous, SMC attempts to argue that a miner exposed to dangerous airborne contaminants while mining is somehow *not* engaged in inherently dangerous activity because he can simply wear a respirator. But, SMC's logic in this regard is severely flawed as it neglects that it alone was responsible for providing adequate

---

[2] *See also Paull v. Park County,* 2009 MT 321, ¶ 21, 352 Mont. 465, collecting activities which have been considered under Montana law to be inherently dangerous, including: (1) highway construction, (2) construction scaffolding, (3) elevators, (4) skiing, (5) felling snag trees, and (6) snowmobiling.

ventilation to Mr. Cobos. Indeed, the flaw in SMC's logic is well-articulated by Rod Breland, a former MSHA safety inspector:

> SMC has recognized in their written policies and procedures there are times where respiratory protection could be necessary. However, they improperly delegated the decision for its use to individual employees and took an approach of making respirator use voluntary. Unfortunately, harmful airborne contaminants are not visible to the naked eye and employees would not have the ability to recognize when a respreator is necessary. The practice to "recommend' or "encourage" employees to wear respirators rather than identifying areas respirators are needed and compelling proper use disregards MSHA requirements and is irresponsible on the part of SMC.

(SUF at ¶ 6); *see also Vannoy, supra* ("It is ludicrous to intimate that working in an atmosphere of deadly, tasteless, odorless and colorless gas without any protective devices is not a dangerous activity.")

Moreover, SMC's argument that Mr. Cobos could have been kept safe through use of a respirator actually supports the fact that the work he was engaged in was inherently dangerous. In *Beckman,* the Montana Supreme Court described what constitutes a "special precaution." In overruling previous decision in *Bechtel, Bighorn*, and *Micheletto,* the Montana Supreme Court explained that those previous decisions "misinterpreted the interplay of 'ordinary' or standard in 'special precautions'." As the Court explained, "although those precautions (sloping, bracing, etc) may be standard on construction sites, they are specifically designed to protect workers from the unreasonable, extraordinary, and unusual risks associated with trenching operations." *Beckman* at ¶¶ 23-24. The Court

further explained "We conclude, however, that requiring workers to enter a trench where they could be buried if a cave in resulted, requires special precautions. Often, the precautions must be tailored to the particular situation." *Id.*  Thus, the *Beckman* decision firmly requires that a duty be imposed on SMC under the Montana Safety Act because wearing a respirator is exactly the type of "special precaution" found at an inherently dangerous workplace.

For these reasons, the Court should find as a matter of law that Mr. Cobos' work as a miner at SMC constituted an inherently dangerous activity, and that SMC therefore had a duty under the Montana Safety Act.

### III.  SMC NEGLIGENTLY EXERCISED CONTROL OVER THYSSEN MINING.

A mine operator is liable under the Montana Safety Act for negligently exercising control over a contractor.  Liability is found where: (1) the operator knows or should know the contractor is performing work in an unreasonably dangerous manner, and (2) the operator retains the authority to direct the manner in which the work is to be performed.

Here, SMC knew or should have known that Thyssen was operating in a negligent fashion.  SMC incentivized Thyssen under the contract to make a bonus based on how quickly its employees could blast.  (SUF at ¶ 13.)  Thus, SMC either did in fact know that Thyssen was cutting corners on worker safety, or should have

known by virtue of the "bonus" contract SMC gave Thyssen, which provided no incentive to operate safely and every incentive to cut corners.

SMC also retained supervisory control over Thyssen with respect to mine safety. The contract provided under the heading "Conduct of the Work" the following pertinent language:

> [H]owever, SMC will exercise the absolute right to direct the immediate cessation or correction of any unsafe or unhealthy act of any individual on the work site.

(SGI at ¶ 5.) Thus, SMC negligently supervised Thyssen, triggering a non-delegable duty under the Montana Safety Act.

### IV. SMC IS STRICTLY LIABLE FOR MR. COBOS' INJURIES.

Restatement (Second) of Torts § 520 (1976), adopted by the Montana Supreme Court, provides:

> In determining whether an activity is abnormally dangerous, the following factors are to be considered:
> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
> (b) likelihood that the harm that results from it will be great;
> (c) inability to eliminate the risk by the exercise of reasonable care;
> (d) extent to which the activity is not a matter of common usage;
> (e) inappropriateness of the activity to the place where it is carried on; and
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

Here, Mr. Cobos was a miner exposed to a colorless, invisible airborne carcinogen. In the context of underground mining, there exists a high degree of

risk that a miner could be exposed to airborne contaminants if not properly tested or controlled. The likelihood that a miner exposed to airborne contaminants will become sick is high. The mine- through a proper ventilation system- can easily remove the risk. Finally, the community favors workers not being exposed to deadly airborne carcinogens. *See, e.g.,the W.R. Grace debacle in Libby.* Thus, as SMC fairly concedes, underground mining is abnormally dangerous as a matter of law.

Mr. Cobos' injuries were caused by the kind of harm that SMC should have reasonably anticipated, e.g., failure to properly test for and control airborne contaminants that could lead to environmental exposure by an underground miner. Therefore, Plaintiff's strict liability claim is well-stated, and should be allowed to be determined by a jury.

## V.     PLAINTIFF'S CONSORTIUM CLAIM IS WELL-PLED IN VIEW OF SMC'S LIABILITY UNDER THE MONTANA SAFETY ACT AND FOR STRICT LIABILITY.

As set forth above, the law is well-settled that SMC owed Mr. Cobos a duty under the Montana Safety Act. Mrs. Cobos' consortium claim derives from those claims and therefore should also be allowed to proceed to determination by the jury.

## CONCLUSION

SMC clearly owed Mr. Cobos a non-delegable duty under any and all of the three enumerated standards. Plaintiff Cobos therefore respectfully requests that the Court grant his Motion for Partial Summary Judgment as to the duty element, and to deny SMC's motion in all respects.

Dated this 7th day of May, 2012.

                                                             BISHOP & HEENAN

                                                             */s/ John Heenan*
                                                                John Heenan

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1, I certify that this brief is printed with proportionally-spaced, Times New Roman text typeface of 14 points, is double-spaced, and the word count calculated by Microsoft Word is 3,024 words excluding the caption, table of contents, table of authorities, certificate of service, and certificate of compliance.

                                                             BISHOP & HEENAN

                                                            */s/ John Heenan*
                                                                John Heenan